MARY E. ALEXANDER, ESQ. (SBN: 104173)
Mary Alexander & Associates, P.C.
44 Montgomery Street, Suite 1303
San Francisco, California 94104
Telephone:  (415) 433-4440
Facsimile:  (415) 433-5440
Email:  malexander@maryalexanderlaw.com

ELIZABETH J. CABRASER (SBN: 083151)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
Email:  ecabraser@lchb.com

GRETCHEN NELSON (SBN: 112566)
Nelson & Fraenkel LLP
601 So. Figueroa Street, Suite 2050
Los Angeles, CA 90017
Telephone:  (213) 622-6469
Facsimile:  (213) 622-6019
Email:  gnelson@nflawfirm.com

*Attorneys for Plaintiffs*
[Additional counsel on signature page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUC CHUNG, BURNETTA EVERETT, DWIGHT EVERETT, DEBRA LEONELLI, DAVID REGE, CONNIE SIMMONS, JAMES SIMMONS, and MICHAEL SIMMONS on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CARNIVAL CORPORATION; CARNIVAL PLC and PRINCESS CRUISE LINES LTD.,<br><br>Defendants. | Case No.:  2:20-CV-04954-DDP-GJS<br><br>**AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>1.   NEGLIGENCE<br>2.   GROSS NEGLIGENCE<br>3.   NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS<br>4.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT AND JURY DEMAND

Individual and representative Plaintiffs DUC CHUNG, BURNETTA EVERETT, DWIGHT EVERETT, CONNIE SIMMONS, JAMES SIMMONS, and MICHAEL SIMMONS, bring this action for themselves and on behalf of all persons similarly situated, including Individual Plaintiffs DEBRA LEONELLI and DAVID REGE, and the more than 2000 other passengers who sailed on the roundtrip Motor Vessel ("M/V") GRAND PRINCESS cruise from San Francisco, California on February 11, 2020, to Mexico, against Defendants, PRINCESS CRUISE LINES LTD. ("PRINCESS"), its parent companies CARNIVAL CORPORATION & CARNIVAL PLC (collectively, "CARNIVAL") and allege:

## THE PARTIES

1.     Individual and representative Plaintiff Duc Chung is *sui juris*, and is a resident of Fresno County, California and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

2.     Individual and representative Plaintiff Burnetta Everett is *sui juris*, and is a resident of Ventura County, California and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

3.     Individual and representative Plaintiff Dwight Everett is *sui juris*, and is a resident of Ventura County, California and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

4.     Individual and representative Plaintiff Connie Simmons is *sui juris*, and is a resident of San Joaquin County, California and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

5.     Individual and representative Plaintiff James Simmons is *sui juris*, and is a resident of Fresno County, California and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

AMENDED CLASS ACTION COMPLAINT FOR
DAMAGES

6.      Individual and representative Plaintiff Michael Simmons is *sui juris*, and is a resident of San Joaquin County, California and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

7.      Individual Plaintiff Debra Leonelli is *sui juris*, and is a resident of San Francisco County, California and was a passenger onboard the Grand Princess cruise from February 11, 2020 through her disembarkation on or about March 10, 2020.

8.      Individual Plaintiff David Rege is *sui juris*, and is a resident of San Francisco County, California and was a passenger onboard the Grand Princess cruise from February 11, 2020 through his disembarkation on or about March 10, 2020.

9.      Defendant CARNIVAL CORPORATION was incorporated in 1972 in Panama and has its headquarters in Miami, Florida.

10.     Defendant CARNIVAL PLC was incorporated in 2000, in Wales, United Kingdom. It also has its headquarters in Miami, Florida.

11.     Upon information and belief, Defendant PRINCESS CRUISE LINES LTD. is incorporated in Bermuda, with its headquarters in Santa Clarita, California.

12.     Upon information and belief, at all times hereto, CARNIVAL CORPORATION, CARNIVAL PLC, and PRINCESS advertised, marketed, sold, and profited (directly or indirectly) from and owned, controlled, and operated the cruise ship, M/V GRAND PRINCESS.

## **ALTER EGO/PIERCING CORPORATE VEIL**

13.     Defendants CARNIVAL CORPORATION, CARNIVAL PLC, AND PRINCESS are alter egos and/or agents of each other such that the corporate form should be disregarded.

14.     CARNIVAL CORPORATION and CARNIVAL PLC operate as a single economic enterprise. They share a senior executive management team and

identical Boards of Directors. Both CARNIVAL CORPORATION and CARNIVAL PLC share a single headquarters in Miami, Florida. They are one and the same.

15.     As described by CARNIVAL CORPORATION in a filing with the Securities and Exchange Commission ("SEC"), "Carnival Corporation and Carnival plc operate a dual listed company ('DLC'), whereby the businesses of Carnival Corporation and Carnival plc are combined through a number of contracts and through provisions in Carnival Corporation's Articles of Incorporation and By-Laws and Carnival plc's Articles of Association."

16.     Plaintiffs bring this lawsuit against CARNIVAL CORPORATION and CARNIVAL PLC individually, but because the entities work as alter-egos and/or agents of one another, Plaintiff refers to them collectively throughout this Complaint as "CARNIVAL."

17.     In the same SEC filings in which CARNIVAL explains the DLC, it also claims a portfolio of cruise brands which it breaks into two segments:  (1) the North America Segment, which includes PRINCESS, and (2) the Europe Australia and Asia Segment.  CARNIVAL represents that, with these two segments, it "operate[s] over 100 cruise ships within a portfolio of leading global, regional, and national cruise brands." CARNIVAL further provides details as to the passenger capacity of each of its subsidiary brands, and each brand's respective percentage of the total capacity of CARNIVAL CORPORATION.

18.     CARNIVAL thus represents to the public that it can properly claim the revenues, income, earnings, assets, carrying capacity, employees, and vessels operating as PRINCESS CRUISE LINES.

19.     Additionally, CARNIVAL claims control over PRINCESS's operations. For instance, in a federal criminal plea agreement signed by CARNIVAL in 2016, CARNIVAL stated that it "currently monitors and supervises

AMENDED CLASS ACTION COMPLAINT FOR
DAMAGES

environmental, safety, security, and regulatory requirements for Princess and other Carnival brands.

20.    As demonstrated above, CARNIVAL has ownership and control over PRINCESS, and CARNIVAL exerts control and domination over PRINCESS's business and day-to-day operations.  Plaintiff believes that further discovery will reveal the full extent of this control.

21.    Further evidencing the permeability of the corporate structures between PRINCESS and CARNIVAL is the fact that the Chief Medical Officer for PRINCESS, Dr. Grant Tarling, serves in the same exact role for each of the cruise lines under CARNIVAL's Holland America Group. In this role, Tarling provided multiple messages to the public on behalf of PRINCESS and CARNIVAL through YouTube and Facebook, regarding the status of the M/V DIAMOND PRINCESS and about safety measures PRINCESS and CARNIVAL claimed to implement on PRINCESS ships.[1]

22.    CARNIVAL and PRINCESS also share the same Board of Directors and almost all of the same executive officers and CARNIVAL and PRINCESS also appear to use the same assets, including the vessel that is the subject of this Complaint.

23.    In fact, in past SEC filings, CARNIVAL has claimed the M/V GRAND PRINCESS as one of its assets. CARNIVAL represents that the M/V GRAND PRINCESS is one of its vessels for the purposes of aggregating CARNIVAL's own worth, financial condition and abilities to the public and in business dealings, allowing it to leverage this value for its own benefit.

24.    Given CARNIVAL's control of operations and co-mingling of assets with PRINCESS—both of which can be more fully established through

---

[1] *See*, *e.g.*, Diamond Princess Update: Dr. Grant Tarling, February 13, 2020, https://www.facebook.com/PrincessCruises/videos/203765767439746/ (last visited August 14, 2020); Dr. Grant Tarling Medical Update with Enhanced Screening and Preventive Health Measures, February 29, 2020, https://www.youtube.com/watch?v=kSOuXwmh9Lo (last visited August 14, 2020).

DAMAGES

discovery—the corporate form should be disregarded here. Failure to do so would thwart the interests of justice by allowing CARNIVAL to, on one hand, claim the M/V GRAND PRINCESS as a part of its holdings, but then, on the other hand, disclaim responsibility for that vessel and the passengers traveling on it.

## **JURISDICTION**

25.     This Court has Admiralty subject matter jurisdiction pursuant to 28 U.S.C. § 1333, as this case involves a maritime tort. The type of incident and injuries suffered by Plaintiffs and the class had the potential to impact maritime commerce as Plaintiffs and the class suffered harm and Plaintiffs and the class were and continue to be at serious risk of imminent harm as a result of exposure to COVID-19 aboard the cruise ship upon which they were paying passengers.

26.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, codified at 28 USC §1332(d)(2)(A) and (C), because the claims of the proposed Class Members exceed $5,000,000 and because at least one member of the Proposed Class of plaintiffs is a citizen of a state different from at least one Defendant. Further, this court has jurisdiction over the claims of certain individual Plaintiffs under 28 U.S.C. § 1332 because the amount in controversy exceeds seventy-five thousand dollars ($75,000), as to each of the individual Plaintiffs and Plaintiffs are citizens of a different state than the Defendants.

27.     This Court has personal jurisdiction over Defendants, who each conduct substantial business in this district.

28.     Defendant PRINCESS has its headquarters in Santa Clarita, California.

29.     Upon information and belief, CARNIVAL, including by and through its subsidiary, PRINCESS, markets cruise vacations to California residents and employs thousands of California residents to work at its California headquarters. The Court has personal jurisdiction over CARNIVAL because CARNIVAL is authorized to do business in California, conducts substantial business in California, and some of the actions giving rise to this Complaint took place in California.

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

30.     The claims asserted herein arise from Defendants' contacts with California.

31.     Additionally, the Passage Contract purports to name the Central District as a proper venue to actions against the Defendants. Although Plaintiffs do not concede the enforceability of the Passage Contract, by naming this District as a proper venue, Defendants have consented to personal jurisdiction in this District.

32.     Each of the facts pleaded herein independently, but also all of these facts together, are sufficient to render the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

<u>**VENUE**</u>

33.     Venue in the Central District of California is proper under 28 U.S.C. § 1391 because Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction.

34.     Additionally, without conceding the enforceability of the Passage Contract, Plaintiffs acknowledge the inclusion in the Passage Contract of a venue selection provision designating the United States District Court for the Central District of California in Los Angeles as a proper venue for this action.

<u>**FACTUAL ALLEGATIONS**</u>

**I.      <u>COVID-19, Its Symptoms, and Long-Term Effects</u>**

35.     In December 2019, a new strain of Coronavirus known as COVID-19 or SARS-CoV-2 was first reported as having been diagnosed in humans in China. The virus quickly spread through China and Asia and has caused a global pandemic.

36.     On January 20, 2020, the United States Centers for Disease Control and Prevention ("CDC") announced the first confirmed case in the U.S. Ten days later, on January 30, 2020, the CDC announced that it had identified, in Illinois, the first known instance of person-to-person spread (i.e. not related to travel outside of the United States).

37.     Also on January 30, 2020, the World Health Organization declared COVID-19 a global health emergency.

38.     When Plaintiffs filed their First Amended Complaint there were approximately 1.7 million cases in the United States. Now, there are over 5 million confirmed cases. In the meantime, almost 60,000 more people in the United States have died as a result of COVID-19 since the filing of the First Amended Complaint—bringing the total death toll to over 162,000 in the United States alone. The death toll worldwide is reported to be more than 760,000 people out of more than 21 million confirmed cases.

39.     The full scope of the impact of this pandemic remains unknown, as reports have indicated that the numbers of cases and deaths may be significantly undercounted.[2] One reason for this undercounting is due to the unavailability and inaccuracy of COVID-19 diagnostic tests in the United States, particularly during the early days of the pandemic.[3] Indeed, the initial test designed by the CDC contained critical flaws, and the process of developing a more accurate test delayed widespread availability of COVID-19 tests by weeks.[4]

40.     Once testing became more widely available—though still not accessible to all those in need—it was, and has remained, inaccurate. In particular,

---

[2] Berkeley Lovelace Jr., *Official U.S. coronavirus death toll is 'a substantial undercount' of actual tally, Yale study finds*, CNBC, July 1, 2020, https://www.cnbc.com/2020/07/01/official-us-coronavirus-death-toll-is-a-substantial-undercount-of-actual-tally-new-yale-study-finds.html (last visited August 12, 2020); Apoorva Mandavilli, *Actual Coronavirus Infections Vastly Undercounted, C.D.C. Data Shows*, New York Times, June 27, 2020 (updated August 6, 2020), https://www.nytimes.com/2020/06/27/health/coronavirus-antibodies-asymptomatic.html (last visited August 12, 2020).

[3] *See* Olga Khazan, *The 4 Key Reasons the U.S. Is So Behind on Coronavirus Testing*, The Atlantic, March 13, 2020, https://www.theatlantic.com/health/archive/2020/03/why-coronavirus-testing-us-so-delayed/607954/ (last visited August 12, 2020).

[4] Caroline Chen, Marshall Allen, Lexi Churchill, and Isaac Arnsdorf, *Key Missteps at the CDC Have Set Back Its Ability to Detect the Potential Spread of Coronavirus*, ProPublica, February 28, 2020, https://www.propublica.org/article/cdc-coronavirus-covid-19-test

CLASS ACTION COMPLAINT FOR DAMAGES

experts warn of false negatives. [5] For instance, one San Francisco resident who traveled on Defendants' ship the DIAMOND PRINCESS reported taking over a dozen COVID-19 tests during a month-long period. The tests returned alternating results of positive and negative.[6]

41.     The concern that negative test results could not be trusted led experts to advise those exposed to COVID-19 to quarantine for 14 days, *even if they tested negative for the virus*. Indeed, as described in more detail below, Defendants and the federal government required Plaintiffs in this case to participate in a two-week quarantine on military bases, and advised that they should do so regardless of a negative test.[7]

42.     Despite the likely drastic undercounting of case and death statistics, the numbers make abundantly clear that COVID-19 spreads swiftly, and poses grave risks to individuals exposed to it.

43.     The means by which the virus spreads are varied, and not yet fully known. Studies tend to show that the virus can be transmitted through person-to-person contact[8], but also through air flow, and on surfaces.[9] In particular, recent studies have indicated that spaces without poor or limited ventilation can cause

---

[5] Lisa M. Krieger, Coronavirus false tests results: With a push to screen come questions of accuracy, The Mercury News, March 19, 2020, https://www.mercurynews.com/2020/03/19/coronavirus-false-test-results-with-the-push-to-screen-come-questions-of-accuracy/ (last visited August 12, 2020).

[6] *Id.*

[7] *Id.*

[8] Centers for Disease Control, How COVID-19 Spreads, Updated June 16, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited August 12, 2020).

[9] *Id.*; *see also* Apoorva Mandavilli, *A Smoking Gun': Infection Coronavirus Retrieved From Hospital Air*, August 11, 2020, https://www.nytimes.com/2020/08/11/health/coronavirus-aerosols-indoors.html (last visited August 12, 2020); Joshua L. Santarpia, et al., *Aerosol and surface contamination of SARS-CoV-2 observed in quarantine and isolation care,* Nature Research Scientific Reports (2020) 10:127732, https://www.nature.com/articles/s41598-020-69286-3

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

greater accumulation of the airborne virus because of the presence of aerosolized droplets that can cause transmission.[10]

44.     Likewise, the length of time that the virus can survive on surfaces remains unclear. But at least one study indicates that items with repeated and/or prolonged contact—such as a phone or television remote control—can carry the virus. The same study also showed the virus present on surfaces, such as floors and window sills, that were untouched by any patient, but which were in the stream of air flow in the patient's room.[11] Another study suggests that transmission is possible through shared elevator buttons.[12]

45.     The virus has an incubation period believed to be approximately 14 days,[13] but many of the ailments associated with COVID-19 persist for weeks and, in some instances, months.[14]

46.     The full extent and longevity of the virus's effects on the human body also remain unclear and—because of the virus's novelty—largely unstudied. The

---

[10] Apoorva Mandavilli, *A Smoking Gun': Infection Coronavirus Retrieved From Hospital Air*, August 11, 2020, https://www.nytimes.com/2020/08/11/health/coronavirus-aerosols-indoors.html (last visited August 12, 2020)

[11] Joshua L. Santarpia, et al., *Aerosol and surface contamination of SARS-CoV-2 observed in quarantine and isolation care,* Nature Research Scientific Reports (2020) 10:127732, https://www.nature.com/articles/s41598-020-69286-3

[12] Aylin Woodward, *As asymptomatic coronavirus carrier infected an apartment neighbor without sharing the same space. A study blames the building's elevator buttons.*, Business Insider, July 5, 2020, https://www.businessinsider.com/coronavirus-jumped-between-people-via-elevator-surfaces-study-2020-7 (last visited August 12, 2020).

[13] Centers for Disease Control, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), Updated June 30, 2020, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited August 12, 2020).

[14] Mark W. Tenforde, et al., *Symptom Duration and Risk Factors for Delayed Return to Usual Health Among Outpatients with COVID-19 in a Multistate Health Care Systems Network –United States, March-June 2020*, Morbidity and Mortality Weekly Report, July 31, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6930e1.htm (last visited August 12, 2020).

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

research that has been conducted suggests that exposure to and contraction of COVID-19 leads to a wide range of medical outcomes, from a mild cough and/or sore throat to sustained cardiac, kidney, liver, neurological, respiratory, and circulatory damage.[15] And, as shown by the statistics reported above, many patients die as a result of contracting the virus.

47.     COVID-19 is sometimes associated with symptoms such as:  fever, cough, shortness of breath, body and muscle aches, and loss of taste and smell. The virus manifests differently, however, in different patients, striking some with brutal swiftness and others with more mild symptoms. Some people who contract the virus have a fever; others do not. Some suffer from extreme fatigue; others do not. Some report having a sore throat; others do not.[16] Some COVID patients never display any of these "typical" symptoms and instead experience COVID-19 as more of a stomach virus, experiencing diarrhea and/or vomiting. Others never experience gastro-intestinal distress. Still, some people test positive for the virus while appearing to be entirely asymptomatic, with no symptoms whatsoever,[17] or only later develop effects from the virus.

48.     The multiple presentations of the disease made it difficult for a patient to immediately attribute their symptoms to COVID-19, especially in the early days of the pandemic, before the general public and treating physicians became more informed as to how the myriad manifestations of the disease.

49.     In addition to—and sometimes separate from—the symptoms described above, the virus can also wreak havoc on patients' organs. COVID-19

---

[15] Tara Parker-Pope, *The Many Symptoms of Covid-19*, The New York Times, August 5, 2020, https://www.nytimes.com/2020/08/05/well/live/coronavirus-covid-symptoms.html (last visited August 12, 2020).

[16] Centers for Disease Control, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), Updated June 30, 2020, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited August 12, 2020).

[17] *Id.*

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

can cause heart and liver failure, kidney damage, neurological deficits, and blood clots that can lead to severe and/or multiple strokes and limb amputation.[18]

50.   Research thus far has shown that patients who are believed to have "recovered" from COVID-19 continue to suffer life-altering and potentially life-threatening health problems.[19] For instance, one study found that at approximately 71 days after a positive COVID-19 test, irrespective of the severity of the patient's symptoms, the time of the original diagnosis, and any pre-existing conditions, 60% of patients evaluated showed signs of "ongoing myocardial inflammation." The same study discovered that 78% of patients demonstrated "cardiac involvement"— that is, these patients had abnormal cardiac readings associated with bad outcomes for cardiomyopathies.[20]

51.   Additionally, some patients who initially experience only mild symptoms (or no symptoms) later suffer catastrophic damage, such as stroke,[21] severe blood clots,[22] and/or cardiac inflammation like that described above.

---

[18] Lenny Bernstein, Carolyn Y. Johnson, Sarah Kaplan and Laurie McGinley. *Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts, and elsewhere.* The Washington Post. April 15, 2020. https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-7db1-11ea-a3ee-13e1ae0a3571_story.html (last visited April 29, 2020).

[19] *See, e.g.*, Diana Lindner, et al., Association of Cardiac Infection With SARS-CoV-2 in Confirmed COVID-19 Autopsy Cases, JAMA Cardiology, July 27, 20202, https://jamanetwork.com/journals/jamacardiology/fullarticle/2768914 (finding "virus progeny" in the heart of autopsied COVID-19 patients).

[20] Valentina O. Puntmann, et al., Outcomes of Cardiovascular Magnetic Resonance Imaging in Patients Recently Recovered From Coronavirus Disease 2019 (COVID-19), JAMA Cardiology, July 27, 2020, https://jamanetwork.com/journals/jamacardiology/fullarticle/2768916 (last visited August 12, 2020).

[21] Ariana Eunjung Cha, Y*oung and middle-aged people, barely sick with covid-19 are dying of strokes*, The Washington Post, April 25, 2020, https://www.washingtonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/ (last visited August 12, 2020).

[22] Tara Parker-Pope, *The Many Symptoms of Covid-19*, The New York Times, August 5, 2020, https://www.nytimes.com/2020/08/05/well/live/coronavirus-covid-symptoms.html (last visited August 12, 2020).

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

52.     And some people contract and carry the virus without manifesting or experiencing any initial symptoms. Due to the newness of the virus, research into its full range of effects on "asymptomatic" patients remains limited. Studies have not yet concluded with any certainty that these patients do not, in fact, suffer physical repercussions as a result of their having been exposed to and carried the virus. However, some medical experts and researchers have reported that these "asymptomatic" patients may in fact suffer long-term and/or later-manifesting harms.

53.     Such occurrences were described by Dr. Jon Drezner, Director of the University of Washington Medicine Center for Sports Cardiology in Seattle, team physician for the Seattle Seahawks, Seattle Reign, and University of Washington Huskies, and advisor to the NCAA on cardiac issues, on an August 11, 2020 CNN broadcast. Drezner explained that "early on in the pandemic we learned that COVID-19 can affect the heart. And about one in four hospitalized have heart injury and raised a lot of questions and concerns about patients who weren't in the hospital."  He continued by posing the question: "Would patients who have mild symptoms or no symptoms have heart injury?" and further explained that, "More recently we've been learning that some college and professional athletes are inflicted with myocarditis (inflammation of the heart which can trigger arrhythmia or cardiac arrest) from COVID-19."

54.     Dr. Drezner confirmed that this potentially long-term damage can afflict someone who was asymptomatic or who experienced only a mild case of COVID-19 that did not require hospitalization. He said:  "We are learning that some athletes who really had no symptoms and go through subsequent testing are being diagnosed with myocarditis[,]" which is, in his words:  "inflammation of the heart muscle and it can lead to scar tissue in the heart.  And that scar tissue can be a focus for arrhythmia or even sudden cardiac arrest."[23]

---

[23] Interview on CNN Anderson Cooper 360 August 11, 2020, transcript available at: http://transcripts.cnn.com/TRANSCRIPTS/2008/11/acd.01.html.

CLASS ACTION COMPLAINT FOR DAMAGES

55.     Likewise, a study that considers, among other things, the lingering impact of the virus on those with mild symptoms is currently underway at the University of California, San Francisco. Among the stuy's findings, is that children exposed to "adult relatives with flu-like symptoms" developed signs of Kawasaki disease, including lesions  on their feet and hands, *weeks or months* after that exposure.[24]

56.     Together, the multiple presentations of the virus, range of severity of symptoms—from asymptomatic to severe—the unavailability and inaccuracy of testing, along with the limited research about COVID-19 make it plausible that a person directly exposed to the virus, particularly for prolonged periods of time, like the passengers on the M/V GRAND PRINCESS, will suffer long-lasting, and potentially life-altering or fatal health effects.

57.     As a result and a proximate cause of Defendants PRINCESS and CARNIVAL exposing Plaintiffs to COVID-19 aboard the M/V GRAND PRINCESS, as described in more detail below, and because of the nature of the virus and its long-term health effects, Plaintiffs will require medical monitoring and diagnostic examinations into the future. This monitoring is required to diagnose, prevent, and/or treat current or future injury related to Plaintiffs' and Class members' exposure to, contraction of, illness and disease related to, asymptomatic contraction of, and potential contraction of COVID-19, in light of the evolving scientific understanding of the full risk and scope of health outcomes related to and/or resulting from the virus.

---

[24] Peter Fimrite, *Long after the illness is gone, damage from coronavirus may remain*, San Francisco Chronicle, May 31, 2020, https://www.sfchronicle.com/health/article/Long-after-the-illness-is-gone-the-damage-from-15305842.php?utm_campaign=CMS%20Sharing%20Tools%20(Premium)&utm_source=share-by-email&utm_medium=email (last visited August 3, 2020)

FIRST AMENDED CLASS ACTION COMPLAINT FOR
DAMAGES

**II.   Carnival and Princess Knew or Should Have Known the Risks of Viral Contagion Aboard Their Cruise Ships.**

58.   In early February 2020, experts in the European Union, led by epidemiologist Dr. Christou Hadjichristodoulou, released specific guidelines for the cruise industry that included an outline of the risk of COVID-19 outbreaks aboard cruise ships and recommended response protocols.[25] Specifically, the guidelines directed that, in the event of a COVID-19 case, "close contacts" of the individuals believed to have COVID-19 should be quarantined in their cabin or on shore, and "casual contacts" should be disembarked from the ship.[26]

59.   Defendants CARNIVAL and PRINCESS represent to their customers and the general public that they have a commitment to "the health, safety, and security" of their passengers and promote their business as one that "always strives to be free of injuries, illness and loss."[27] They further assert that they "[s]upport a proactive framework of risk mitigation in the areas of HESS [Health, Environment, Safety, Security] aimed at preventing, monitoring and responding to threats."[28]

---

[25] Interim Advice for Preparedness and Response to Cases of Acute Respiratory Disease at Points of Entry in the European Union (EU) / EEA Member States (MS): Advice for ship operators for preparednessand response to the outbreak of 2019-nCoV acute respiratory disease, Feb. 3, 2020, https://www.gac.com/491364/siteassets/about-gac/coronavirus/eu-interim-advice_2019-ncov_maritime_4_2_2020_f.pdf (last visited April 6, 2020); *see also* Matt Apuzzo, Motoko Rich and David Yaffe-Bellany, *Failures on Diamond PrincessShadow Another Cruise Ship Outbreak*, The New York Times, March 8, 2020, https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html (last visited April 6, 2020).

[26] Healthy GateWays, Algorithm for decision making in response to an event of a suspect case of COVID-19, https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html (last visited April 6, 2020).

[27] Carnival Health, Environment, Safety, Security & Sustainability Policy & Governance, Carnival Health, Environment, Safety, Security & Sustainability Policy & Governance, https://www.carnivalcorp.com/leading-responsibly/health-environment-safety-security-sustainability-policy-governance/ (last visited April 7, 2020).

[28] Carnival Corporation & PLC Health, Environmental, Safety, Security, and Sustainability Corporate Policy, https://www.carnivalcorp.com/static

CLASS ACTION COMPLAINT FOR DAMAGES

60.     However, in or before early February 2020, Defendants became aware of an outbreak of COVID-19 aboard the cruise ship the DIAMOND PRINCESS, which is owned and/or operated by CARNIVAL and PRINCESS. The outbreak originated on the DIAMOND PRINCESS while the vessel was docked in Yokohama, Japan. Ten cases were originally diagnosed, and that number rapidly escalated to over 700 cases—over one-fifth of the passengers and crew members onboard the ship at the time. Investigative reporting about the DIAMOND PRINCESS revealed that well after CARNIVAL and PRINCESS became aware of the first case aboard the ship, Defendants worked to "keep the fun going" by "encouraging [guests] to mingle."[29]

61.     To date, at least 14 of the DIAMOND PRINCESS's passengers have died as a result of COVID-19.[30] At least two of these fatalities occurred before February 19, 2020.[31]

62.     On February 13, 2020, Dr. Grant Tarling posted a "Diamond Princess Update" on Facebook, explaining that six days after learning that a man aboard the ship was diagnosed with COVID-19, "all guests and crew were evaluated for symptoms of the illness and the first batch of several hundred laboratory samples were taken from individuals with symptoms or suspected to have been exposed to the virus."[32]  Thus, Defendants were not only aware of the potential for outbreak,

files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last visited April 7, 2020).

[29] Austin Carr and Chris Palmieri, *Socially Distance This: Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going*, Bloomberg, April 16, 2020,  https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/ (last visited April 20, 2020).

[30] Lauren Smiley, *27 Days in Tokyo Bay: What Happened on the Diamond Princess*, Wired, May 13, 2020, https://www.wired.com/story/diamond-princess-coronavirus-covid-19-tokyo-bay/.

[31] *See* The New York Times, *Japan Reports 2 Deaths Among Cruise Ship Passengers*, Feb. 19, 2020, https://www.nytimes.com/2020/02/19/world/asia/china-coronavirus.html (last visited April 6, 2020).

[32] Diamond Princess Update: Dr. Grant Tarling, February 13, 2020, https://www.facebook.com/PrincessCruises/videos/203765767439746/ (last visited August 14, 2020).

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

but also of steps that should be taken immediately after learning of a positive case onboard.

63.     Additionally, Dr. Tarling explained that Japanese health authorities "expected" there would be additional cases onboard the ship due to the exposure passengers and crew members experienced due to contact with the diagnosed individual and his close contacts.[33]  Obviously, Defendants knew that even just one positive COVID-19 case onboard one of their cruise ships could expose and infect dozens or more other passengers, leading to an outbreak.

64.     What's more, Dr. Tarling's Facebook post identified the symptoms the medical staff onboard the ship were witnessing from those with COVID-19. Leadership at Princess and Carnival were well aware of what to look for in high risk situations, and knew how to advise passengers.[34]  But, as Plaintiffs here would discover, Defendants' did not apply their lessons from the DIAMOND PRINCESS to subsequent cruises.

65.     In a February 18, 2020, update issued in response to the crisis aboard the DIAMOND PRINCESS, the CDC stated that "the rate of new reports of positives [now] on board, especially among those without symptoms, highlights the high burden of infection on the ship and potential for ongoing risk."[35]

66.     Upon information and belief, in February 2020, CARNIVAL and PRINCESS also operated a voyage on the RUBY PRINCESS, from New Zealand to Australia. News reports suggest that in mid-to-late February, Defendants became aware of COVID-19 cases onboard the RUBY PRINCESS. Despite this information, CARNIVAL operated a second voyage on the RUBY PRINCESS, immediately following the New Zealand-to-Australia voyage. Since the vessel

---

[33] *Id.*

[34] *Id.*

[35] *See* Centers for Disease Control and Prevention, Update on the Diamond Princess Cruise Ship in Japan, Feb. 18, 2020, https://www.cdc.gov/media/releases/2020/s0218-update-diamond-princess.html (last visited April 6, 2020).

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

docked in Australia on March 19, 2020, over 600 passengers who were on the RUBY PRINCESS have tested positive for the virus and 10 have died. Australian authorities have announced a criminal investigation into the matter.

67.     To date, cruises run by CARNIVAL and PRINCESS have been identified as responsible for more than 1,500 positive COVID-19 infections, and almost 40 deaths.

**III.     What Makes Cruise Ships Different From Other Businesses**

68.     In some material respects, in the context of COVID-19 claims, common carriers like cruise ships undertaking custodial, long-haul, open-water voyages present heightened risks to passengers that differ from other land-based businesses. With these heightened risks, as factual and legal matters, come additional attendant obligations on the owners and operators of cruise ships.

69.     As Defendants knew, cruise ships are particularly susceptible to rapid viral contagion because—unlike other businesses, such as restaurants, retail shops, and other consumer-facing businesses—after embarkation, passengers are effectively trapped onboard. PRINCESS and CARNIVAL had a custodial role over their passengers, who had no option for safe and fast exit while the vessel remained at sea.

70.     Cruise ships like M/V GRAND PRINCESS have a high population density, and the population is characterized by "relatively homogenous mixing"— meaning, there are a lot of people onboard, and they are all interacting with one another.[36]

71.     CARNIVAL and PRINCESS were and are well-aware of the fact that their crew members interact closely with passengers and often travel on multiple trips back-to-back, putting crew members into close contact with thousands of

---

[36] J. Rocklov and H. Sjodin, COVID-19 outbreak on the Diamond Princess cruise ship: estimating the epidemic potential and effectiveness of public health countermeasures, Journal of Travel Medicine, Published February 28, 2020, https://academic.oup.com/jtm/article/27/3/taaa030/5766334 (last visited August 12, 2020).

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

passengers in short periods of time. What's more, these crew members and the ship's passengers share a number of confined, public spaces—such as elevators and public restrooms—and interact with a myriad of shared, and frequently-touched surfaces, including but certainly not limited to the utensils used to serve food on buffet lines, elevator buttons, hand railings, chairs, cards and other game pieces, and door handles. The frequency with which individuals touch these surfaces along with the sheer number of people who come into contact with them in a limited period of time make cruise ships uniquely dangerous for the spread of viruses, including COVID-19.

72.     CARNIVAL and PRINCESS also understood, based on their years of specific experience operating cruise ships, the limited air flow and low ventilation in the interior of cruise ships, and they knew that these conditions make airborne viruses all the more hazardous on board a ship, particularly where passengers are exposed for a lengthy period of time during a long-haul, open-water voyage.

73.     The combination of the aforementioned factors, among other factors, make cruise ships distinctly susceptible to rapidly and pervasively spreading pathogens in ways that differ from most other businesses, which was well-known to Defendants.

74.     Years before the COVID-19 outbreaks aboard the DIAMOND PRINCESS, RUBY PRINCESS, and M/V GRAND PRINCESS, CARNIVAL and PRINCESS's own Group Senior Vice President and Chief Medical Officer Grant Tarling, M.D., M.P.H. co-authored an article that acknowledged that cruise ships "represent a potential source for introduction of novel or antigenically drifted influenza virus strains to the United States" and that cruise ship characteristics, such as "close quarters and prolonged contact among travelers on ships and during land-based tours before embarkation, increase the risk of communicable disease transmission."[37]

---

[37] Kimberly B. Rogers, MPH, Shahrokh Roohi, MPH, Timothy M. Uyeki, MD, *et al.*, *Laboratory-based respiratory virus surveillance pilot project on select cruise*

75.     A study published on February 28, 2020, echoed Dr. Tarling's findings, and highlights the unique conditions of cruise ships that "amplified" the spread of COVID-19 among those onboard the Diamond Princess.[38] The study also revealed that extended periods of time on the ship without quarantine increased the spread of the virus.

76.     PRINCESS and CARNIVAL were aware of passengers' reasonable reliance on them, and held themselves out as being committed to ensuring passengers' safety and well-being. CARNIVAL'S Health, Environment, Safety and Security Policy describes, in CARNIVAL's words, its "commitments to: Protecting the health, safety and security of our passengers, guests, employees and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and loss. … [and] assigning health, environment, safety, security (HESS) and sustainability matters the same priority as other critical business matters."[39] Notably, this website specifically identifies PRINCESS as a part of CARNIVAL CORPORATION and CARNIVAL PLC, represenging that the policy applies to the subsidiary as well as the parent.

77.     In furtherance of these commitments, CARNIVAL's HESS Corporate Policy states that the company will, among other things, "[s]upport a proactive framework of risk mitigation in the areas of HESS aimed at *preventing, monitoring, and responding to threats*."[40] It also states that CARNIVAL will "Promptly report

---

*ships in Alaska, 2013-2015*, Journal of Travel Medicine 2017, 1-6, at 2 (2017).

[38] J. Rocklov and H. Sjodin, *COVID-19 outbreak on the Diamond Princess cruise ship: estimating the epidemic potential and effectiveness of public health countermeasures*, Journal of Travel Medicine, Published February 28, 2020, https://academic.oup.com/jtm/article/27/3/taaa030/5766334 (last visited August 12, 2020).

[39] Carnival Corporation & PLC, Health, Environment, Safety, Security & Sustainability Policy & Governance, https://www.carnivalplc.com/leading-responsibly/health-environment-safety-security-sustainability-policy-governance (last visited August 14, 2020).

[40] *Id.* (emphasis added).

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1  and properly investigate all HESS incidents and take appropriate action to prevent
2  recurrence."[41]

3       78.    The PRINCESS website states that the "health and well-being of [its]
4  guests and crew is [its] highest priority," and touts the availability of 24-hours on-
5  call medical staff, and its protective measures and health facilities that "meet or
6  exceed standards" set by the US Centers for Disease Control and the American
7  College of Emergency Physicians.

8       79.    PRINCESS also points potential passengers to the Cruise Industry
9  Passenger Bill of Rights, which explaisn that "Members of the Cruise Lines
10  International Association are *dedicated to the comfort and care of all passengers* on
11  oceangoing cruises throughout the world."[42]

12       80.    Given these assurances and representations, PRINCESS and
13  CARNIVAL undertook a duty to abide by that commitment and to protect
14  passengers from reasonably-avoidable hazards, such as exposing passengers for a
15  prolonged period of time on a ship known to be infested with a potentially-lethal
16  virus.

17  **IV.**    **The February 11, 2020 M/V GRAND PRINCESS Cruise to Mexico**

18       81.    Despite their awareness of the unique risks created by the cruise ship
19  environment, and their experiences with COVID-19 outbreaks on other vessels, on
20  February 11, 2020—approximately ten days after Defendants learned about the
21  infection aboard the DIAMOND PRINCESS—Defendants boarded Plaintiffs and
22  over 2,000 other passengers onto the M/V GRAND PRINCESS for a roundtrip
23  voyage to Mexico without conducting any effective medical screenings for
24  passengers and without providing any additional information about best practices to
25  mitigate or prevent the spread of COVID-19.

26

27     —————————————
28  [41] *Id.*
   [42] Princess, Cruise Industry Passenger Bill of Rights,
   princess.com/legal/bill_of_rights/ (last visited August 14, 2020) (emphasis added).

82.     Upon information and belief, throughout the course of the 10-day voyage to Mexico, Defendants did not alter their on-ship protocols, event itineraries, or cleaning and disinfectant practices in order to prevent the spread of COVID-19. Defendants did not, for example, institute any medical examination or screening procedures for passengers leaving and returning to the ship at any of the M/V GRAND PRINCESS's ports of call. Nor did Defendants provide passengers onboard the M/V GRAND PRINCESS any information about COVID-19.

83.     On or around February 19, 2020, PRINCESS and CARNIVAL became aware of at least one passenger suffering from COVID-19 symptoms onboard the M/V GRAND PRINCESS, but neither Defendant alerted Plaintiffs or other passengers aboard the ship, and did not put into place any quarantine requirements or shelter-in-place and social distancing protocols.

84.     According to PRINCESS's and CARNIVAL's Chief Medical Officer, Grant Tarling, MD, MPH, Defendants believed the infected passenger was carrying the virus when he boarded the M/V GRAND PRINCESS on February 11, 2020, but because Defendants did not provide any effective method of screening for passengers at the time of boarding, Defendants were unaware of his condition.[43]

85.     Dr. Tarling reported that the infected passenger sought medical treatment from the medical center onboard the M/V GRAND PRINCESS on February 20, 2020. The passenger reported suffering from "acute respiratory distress" for about a week before seeking treatment. Dr. Tarling did not say whether the passenger had sought any medical help prior to February 20, 2020. Upon information and belief, this information would have triggered mandatory reporting under 42 C.F.R. 71.1 *et seq.* and constitutes a "hazardous condition" per 33 C.F.R. § 160.216.[44]

---

[43] Thomas Fuller, John Eligon, and Jenny Gross, *Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland*, The New York Times, March 9, 2020, https://www.nytimes.com/2020/03/09/us/coronavirus-cruise-ship-oakland-grand-princess.html (last visited April 7, 2020).

[44] Section 160.216 requires that "[w]henever there is a hazardous condition

AMENDED COMPLAINT FOR
DAMAGES

86.     While onboard the MV GRAND PRINCESS, Plaintiff Connie Simmons became extremely ill and suffered from a fever. The cabin steward visited her room and refused to enter. Following this visit, on the seventh day of the cruise, a cruise ship staff member came to her room in full hazmat gear. A physician never visited her. Instead medical personnel aboard the ship repeatedly told her that she would have to visit medical facilities onboard, even though she was unable to walk that far. After disembarking from the trip on February 21, 2020, Connie Simmons suffered coughing, shortness of breath, blood clots in her right lung, and various other ailments forcing her to take over five weeks off of work.

87.     Plaintiff Dwight Everett also became ill while onboard. On or around February 15, Mr. Everett lost his appetite and suffered from other symptoms consistent with COVID-19. He chose to self-isolate in his cabin. After disembarking from the cruise and returning to his home, Mr. Everett tested positive for COVID-19.

88.     Upon information and belief, at least three other passengers on the M/V GRAND PRINCESS's Mexico trip suffered from COVID-19 symptoms while on the vessel, exposing other passengers, including Plaintiffs, and crew members onboard the ship to the virus. At least 100 passengers who traveled on board the M/V GRAND PRINCESS have tested positive for COVID-19, and at least two passengers who traveled on the M/V GRAND PRINCESS's Mexico trip died after disembarking.[45] One of these fatalities was the first-reported death caused by COVID-19 in California.[46]

---

board a vessel or caused by a vessel or its operation, the owner, agent, master, operator, or person in charge must immediately notify the nearest Coast Guard Sector Office . . . ." A "[h]azardous condition means any condition that may adversely affect the safety of any vessel … or the environmental quality of any port, harbor, or navigable waterway of the United States. It may, but need not, involve … injury *or illness of a person aboard* … ." 33 CFR § 160.202 (emphasis added).

[45] Mark Berman, *Two Grand Princess passengers die from coronavirus, officials say*, The Washington Post, March 25, 2020, https://www.washingtonpost.com/nation/2020/03/25/two-grand-princess

COMPLAINT FOR DAMAGES

89.     On February 21, 2020, the M/V GRAND PRINCESS arrived at port in San Francisco and most of the passengers from the Mexico trip disembarked, though some remained onboard to travel on the ship's subsequent voyage headed to Hawaii.

90.     Plaintiff Duc Chung became ill the day after disembarking from the M/V GRAND PRINCESS. He suffered from a cough, sore throat, irritated eyes, and other symptoms. He reported himself to the public health department, and self-quarantined for five days, during which he was off of work.

91.     Additionally, in the days following his trip on the M/V GRAND PRINCESS, Plaintiff James Simmons suffered from a sore throat, cough, a fever and chills. He was forced to miss eight days of work, five of which were due to his having to self-quarantine.

92.     Upon information and belief, on or about February 25, 2020, CARNIVAL and PRINCESS emailed Plaintiffs and their fellow passengers that had traveled on the M/V GRAND PRINCESS's trip to Mexico alerting them that some of their fellow passengers had suffered from COVID-19 and that they may have been exposed to COVID-19.

93.     On March 4, 2020, Defendants alerted passengers who had embarked upon the M/V GRAND PRINCESS on February 21, 2020, immediately following Plaintiff's voyage, about a "small cluster of COVID-19 cases in Northern California" related to Plaintiff's Mexico-bound trip aboard the ship. Upon

---

passengers-died-coronavirus-officials-say/ (last visited May 19, 2020).

[46] It has since been discovered that other Californians suffered from and died as a result of COVID-19 prior to the February 11, 2020 cruise aboard the M/V GRAND PRINCESS. Nevertheless, the death of a Placer County resident who traveled on the M/V GRAND PRINCESS's February 11, 2020 cruise to Mexico spurred the state's initial stay-at-home orders. *See* Placer County Announces Death of Patient with COVID-19, March 4, 2020, https://www.placer.ca.gov/6438/Death-of-patient-with-COVID-19 (last visited May 19, 2020); Bill Chapel, *Coronavirus Deaths in Washington and California, Where Gov. Declares Emergency*, NPR, March 4, 2020, https://www.npr.org/sections/health-shots/2020/03/04/812121540/coronavirus-los-angeles-declares-emergency-and-u-s-reports-80-cases-in-13-states (last visited May 19, 2020).

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

information and believe, Defendants knew before or at that time that M/V GRAND PRINCESS passengers on the February 21, 2020, voyage were currently suffering from COVID-19 and that there potentially an outbreak.

94.     Spurred by information regarding conditions onboard the M/V GRAND PRINCESS during its Hawaii voyage, and by the death of a passenger who had been onboard the ship during Plaintiff's Mexico-bound trip, Governor Gavin Newsom declared a state of emergency on March 4, 2020, to manage the COVID-19 outbreak in California. As a result, the State of California refused to allow the vessel into port in San Francisco, forcing the vessel to anchor off the city's coast. Governor Newsom stated at a press conference that there were 11 passengers and 10 crew members experiencing symptoms.

95.     On or about Thursday, March 5, 2020, two weeks after the M/V GRAND PRINCESS sailed for Hawaii, Defendants instituted some changes in their operation of the vessel, including cabin/state room quarantine, meal service within the cabins/state rooms, and cessation of daily turndown service and communal activities. Defendants had never instituted these protocols during Plaintiffs' trip, despite knowing about the potential for contagion aboard the cruise ship, and despite becoming aware, while the ship was still at sea, that at least one passenger was suffering from COVID-19.

96.     On or around March 6, 2020—two weeks after Plaintiffs disembarked from their trip, and even longer after Defendants became aware a passenger was suffering from COVID-19 symptoms onboard—Plaintiff Connie Simmons received a letter from Defendants alerting her that she may have been exposed to COVID-19 while onboard the M/V GRAND PRINCESS. On information and belief, other passengers from the instant voyage received similar correspondence from Defendants.

97.     At the time of this filing, Defendant CARNIVAL has cancelled future cruises embarking from San Francisco through the end of 2020.  However,

1   CARNIVAL's website indicates that it intends to begin operating certain cruise

2   ships as early as August 1, 2020, potentially posing grave threats to their

3   passengers, crew members, and the public health.[47]

4        98.    If Plaintiffs had known the serious and actual risks of contracting or

5   spreading COVID-19 while onboard the M/V GRAND PRINCESS, Plaintiffs

6   would not have sailed on the February 11, 2020, roundtrip voyage to Mexico. Or, at

7   minimum, if they had been made aware after embarkation of the growing and

8   continued risk, they would have disembarked from the ship at one of its ports of

9   call.

10  **V.      The Passage Contract**

11       99.    The Passage Contract provided to Plaintiffs and Class members prior

12  to the embarkation of the cruise purports to govern Plaintiffs' claims and available

13  remedies.

14       100.   The Passage Contract is a standardized contract of adhesion written by

15  Defendants and provided to Plaintiffs and Class members with no opportunity for

16  review or negotiation.

17       101.   The Passage Contract is unfairly one-sided, against public policy,

18  unconscionable and, as such, in unenforceable.

19       102.   Plaintiffs and Class members did not receive the Passage Contract , if

20  at all, until well after 90 days prior to the subject cruise. Providing the Passage

21  Contract to passengers at this late date constitutes surprise and is procedurally

22  unconscionable.

23       103.   After 90 days, Plaintiffs could not cancel their cruise without being

24  subject to a cancellation fee, the full cost of which escalated as the date of the cruise

25  approached.

26

27

28

---

[47] *See* Carnival, Health and Safety Updates, https://www.carnival.com/health-and-sailing-updates (last visited May 31, 2020).

AMENDED CLASS ACTION COMPLAINT FOR
DAMAGES

104.   Princess advertises its "standard cancellation policy" for sailings of 6 to 24 days—which includes the cruise that is the subject of this action—as charging 100% of all total charges if a passengers cancels within 14 days of the voyage.

105.   For cancellations made between 29 and 56 days prior to the voyage, Princess charges a fee equivalent to 50% of total charges, and for cancellations made between 15 and 28 days prior to the voyage, a 75% fee is charged.  This amounts to thousands of dollars Plaintiffs and Class members would be forced to pay if, upon receipt of the Passage Contract, they refused to be subject to its terms.

106.   Plaintiffs were not reasonably informed of the Passage Contract, including its class waiver provision. If they had been reasonably informed, their only recourse to reject the provision would have required canceling their reservations, which would have subjected Plaintiffs to potentially thousands of dollars in monetary penalties, including forfeiture of their deposits and/or purchase amount. The effect of delivering this standard, un-negotiated contract, to passengers at such a late date was to force Plaintiffs to accept the terms of the Passage Contract with no viable recourse.

107.   By purporting to strip Plaintiffs and Class members of their rights to pursue class action litigation, Princess and Carnival effectively give themselves license to engage in bad business practices and dangerous and/or negligent conduct, regardless of whether it will harm passengers in the aggregate, because Defendants know that it will be impossible for *all* passengers to file suit and seek a remedy for their injuries.

## VI.   <u>The CDC's Definition of a "Probable Case"</u>

108.   In an April 5, 2020 position statement, the CDC and the Council of State and Territorial Epidemiologists ("CSTE") provided an "interim case definition" for COVID-19 for the purposes of counting and tracking "probable" and "confirmed" COVID-19 cases in the United States.[48]

---

[48] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19) 2020 Interim Case Definition, Approved April 5, 2020,

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

109.   The interim definition provided three alternative clinical measures for evaluating a patient.

110.   First, a case meets the clinical criteria if there is no alternative more likely diagnosis and at least two of the following symptoms are present:  fever (measured or subjective), chills, rigors, myalgia, headache, sore throat, or new olfactory and taste disorder(s).

111.   Second, a case meets the clinical criteria if there is no alternative more likely diagnosis and at least one of the following symptoms are present:  cough, shortness of breath, or difficulty breathing.

112.   Third, a case meets the clinical criteria if there is no alternative more likely diagnosis and a patient suffers from severe respiratory illness with at least one of either clinical or radiographic evidence of pneumonia or acute respiratory distress syndrome.

113.   The interim definition also provided that a case meets the laboratory criteria if there are positive results returned from a diagnostic test, an antigen test, or an antibody test.

114.   And, the CDC and CSTE identified a number of "epidemiological" criteria that should be considered when evaluating a potential COVID-19 case. Specifically, whether the patient was within 6 feet for 10 to 30 minutes or more with a person who has a confirmed or probable COVID-19 case; whether the patient was within 6 feet for 10 to 30 minutes or more with a person with a "clinically compatible illness" and some link exists to a confirmed COVID-19 case; whether the patient traveled to or resided in an area with sustained, ongoing community transmission of COVID-19; and/or whether the patient is a member of an at-risk cohort.

https://wwwn.cdc.gov/nndss/conditions/coronavirus-disease-2019-covid-19/case-definition/2020/ (last visited August 14, 2020).

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

115.   Patients who meet both the clinical and epidemiological criteria are considered probable COVID-19 cases, as are those patients who presumptively meet the laboratory critera and either the clinical or epidemiological criteria.

116.   The position statement also recognized that "field investigations will involve evaluations of persons with *no symptoms* and *these invididuals will need to be counted as cases*."

117.   In addition to the above-listed clinical criteria, the CDC has published more up-to-date information regarding the range of symptoms created by COVID-19. This list, which the CDC concedes is not comprehensive, includes:

    a.    Fever or chills

    b.    Cough

    c.    Shortness of breath or difficulty breathing

    d.    Fatigue

    e.    Muscle or body aches

    f.    Headache

    g.    New loss of taste or smell

    h.    Sore throat

    i.    Congestion or runny nose

    j.    Nausea or vomiting

    k.    Diarrhea[49]

## VII.   PLAINTIFFS' MEDICAL EXPERIENCES

118.   Plaintiffs were all exposed, in close proximity for extended periods of time, to individuals who were or were probably carrying COVID-19, including crew members onboard the M/V GRAND PRINCESS and their fellow passengers. Likewise, for almost two weeks, Plaintiffs effectively "resided in" a community—the cruise ship—that experienced sustained and ongoing transmission, as is

---

[49] Center for Disease Control and Prevention, Symptoms of Coronavirus, Updated May 13, 2020 https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html# (last visited August 14, 2020)

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

evidenced by the vast number of passengers onboard the vessel who became ill with COVID-19. Most Plaintiffs also suffered symptoms in line with the clinical criteria identified by the CDC and CSTE.

119.   As a direct and proximate result of Defendants' acts and omissions, Plaintiff DUC CHUNG suffered from a cough, sore throat, irritated eyes, a fever, chills, muscle aches, diarrhea, dizziness, loss of taste and smell, loss of appetite, chest pain and pressure, sleep disruption—all symptoms associated with COVID-19.

120.   As a direct and proximate result of Defendants' acts and omissions, Plaintiff BURNETTA EVERETT suffered from a dry cough and extreme joint pain in her legs—symptoms associated with COVID-19.

121.   As a direct and proximate result of Defendants' acts and omissions, DWIGHT EVERETT contracted and tested positive for COVID-19.  He suffered from extreme headaches, join pain, inability to sleep, night sweats, nausea, loss of appetite, severe fatigue, altered sense of taste, as well as dry, itchy skin.

122.   As a direct and proximate result of Defendants' acts and omissions, Plaintiff CONNIE SIMMONS suffered from severe diarrhea, severe cough, shortness of breath, chest pain, an eye infection, severe fatigue, loss of appetite, nausea, a sore throat, fever, chills, congestion and runny nose, blisters on her toes, and she lost her sense of taste—all symptoms associated with COVID-19..  Some of these symptoms lasted for weeks; others lasted for months.  Additionally, Ms. Simmons suffered from pneumonia, and a blot clot in her lung, both of which are negative health outcomes associated with COVID-19.

123.   As a direct and proximate result of Defendants' acts and omissions, Plaintiff JAMES SIMMONS suffered from a cough, sore throat, a fever, chills, body aches, shortness of breath, headache, diarrhea, and loss of appetite—all symptoms associated with COVID-19.

124.   As a direct and proximate result of their negligence and gross negligence Defendants exposed Plaintiffs and Class Members to COVID-19, actual risk of immediate physical injury, and, in many cases, already-manifested actual physical injury.  As a direct and proximate result of their exposure to COVID-19, Plaintiffs and Class Members have suffered physical injuries as described above, as well as emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame.

125.   In addition, Plaintiffs and Class Members were traumatized by their direct exposure to COVID-19, the risk that they would contract the virus, and the reasonable apprehension associated with that risk.

126.   Furthermore, as noted above, public health experts and physicians continue to learn more about the myriad ways COVID-19 attacks and damages the body, including long-lasting harms to the cardiovascular system,[50] and to the kidneys, liver, and neurological system, potentially even in "asymptomatic" patients.

127.   Plaintiffs and Class Members develop new and evolving medical concerns and uncertainties that require and will continue to require medical diagnostic exams. Plaintiffs and the Class Members are suffering and will continue to suffer due to the ever-present anxiety and reasonable apprehension that they will or may later experience negative health outcomes or complications as a direct and proximate result of being exposed to COVID-19 because of Defendants' negligent and grossly negligent acts and omissions.

---

[50] Valentina O. Puntmann, et al., Outcomes of Cardiovascular Magnetic Resonance Imaging in Patients Recently Recovered From Coronavirus Disease 2019 (COVID-19), JAMA Cardiology, July 27, 2020, https://jamanetwork.com/journals/jamacardiology/fullarticle/2768916 (last visited August 12, 2020).

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

128.   It is expected that, as a result of Defendants' negligence and gross negligence, they will continue to suffer and will, in the future, require medical services outside of the kinds accepted as part of the typical wear and tear of daily life.

### REQUEST FOR INJUNCTIVE RELIEF

129.   Plaintiffs traveled on the M/V GRAND PRINCESS, a cruise ship owned and operated by CARNIVAL and PRINCESS. In the future, Plaintiffs would like to go on cruises again, including cruises operated by Defendants, if corrective action is taken such that Plaintiffs can reasonably rely on Defendants to protect their health and safety.

130.   Indeed, Defendants have proactively marketed to Plaintiffs and Class members, who were passengers onboard the M/V GRAND PRINCESS, urging them to schedule future cruises with the companies. Defendants have offered reduced fares and other incentives to encourage Plaintiffs and the Class to book future travel with CARNIVAL and PRINCESS. And, Defendants continue to offer assurances that they are taking proactive measures to combat COVID-19 aboard their ships and prevent future outbreaks.

131.   For instance, PRINCESS asserts that guests can "cruise with confidence,"[51] and provides a health advisory asserting future trips will include thermal scanning, health screening, enhanced screening for "certain guests and crew", and "heightened sanitation of cruise terminals."[52]

132.   CARNIVAL also states that they will be providing "health screening, illness surveillance, and health education" along with "environmental sanitization" in order to protect passengers on future cruises.[53]

---

[51] Princess hompage, https://www.princess.com/ (last visited August 14, 2020).

[52] Princess COVID-19 Update: Crusie with Confidence, April 14, 2020, https://www.princess.com/downloads/pdf/plan/Health-Advisory-and-Travel-Safety-Procedures.pdf (last visited August 14, 2020).

[53] Carnival Corporation & PLC, Investor Relations: Carnival Corporation Update on Operations, https://www.carnivalcorp.com/Updates-on-Cruise-Operations (last

FOURTH AMENDED COMPLAINT
DAMAGES

133.   As noted above, Defendants have advertised that they plan to begin operating cruises as early as October 31, 2020. There can be no guarantee that COVID-19 will not be present and still rapidly spreading throughout communities in the United States and internationally. Thus, exposure to COVID-19 will continue to be a significant risk to passengers on cruise ships—including Plaintiffs when they travel—absent appropriate, effective measures from CARNIVAL and PRINCESS.

134.   Without accurate and necessary information from CARNIVAL and PRINCESS regarding the risks of exposure onboard their vessel(s), recent exposure or potential exposure of passengers and crew members onboard their vessel(s), and whether CARNIVAL and PRINCESS have any reason to believe that their vessel(s) may be infested with COVID-19 or other communicable disease, Plaintiffs will not be able to make informed decisions about whether to travel on cruises operated by CARNIVAL and PRINCESS.

135.   Another critical concern for Plaintiffs, who plan to take cruises again when they are able to do so, is whether they can rely on PRINCESS and CARNIVAL to faithfully inform Plaintiffs and other future cruise passengers about potential safety hazards, including and especially viral outbreaks, and whether PRINCESS and CARNIVAL will take reasonable and necessary steps to protect from and mitigate risks and harms associated with communicable diseases, including COVID-19.

136.   This concern is especially acute for Plaintiffs here in light of the multiple outbreaks experienced by passengers onboard vessels owned by PRINCESS and CARNIVAL, including but not limited to the M/V GRAND PRINCESS. Plaintiffs also expect that, absent an injunction, they will experience future injury because CARNIVAL and PRINCESS previously asserted their commitment to passengers' safety, well-being, and comfort and assured certain

visited August 14, 2020).

1   Plaintiffs that they would institute particular screening measures, but then failed to

2   do so, and failed to take other effective measures to ensure that Plaintiffs were not

3   exposed to COVID-19.

4          137.   Moreover, CARNIVAL and PRINCESS's actions and omissions

5   plausibly exacerbated and hastened the spread of COVID-19 onboard the M/V

6   GRAND PRINCESS, exposing Plaintiffs to a potentially-lethal viral contagion.

7          138.   Plaintiffs face a real threat that, absent an injunction, they are likely to

8   be subject to the same acts and omissions by CARNIVAL and PRINCESS that will

9   once again expose them to COVID-19 and/or other communicable disease that will

10  cause them injury and emotional harms.

11         139.   Without injunctive relief, Plaintiffs cannot be assured that

12  CARNIVAL and PRINCESS will discharge their duties to Plaintiffs on future

13  cruise voyages and/or that they will abide by the representations and assurances that

14  they have made to Plaintiffs, and are likely to once again suffer harms like those

15  alleged in this Complaint.

16                                      **NOTICE**

17         140.   Section 16(A)(i) of the Passage Contract purports to require that

18  claimants provide notice to PRINCESS and CARNIVAL of any potential claims.

19  Although Plaintiffs do not concede that this provision is enforceable, Plaintiffs and

20  Class Members have complied with this requirement by providing written notice to

21  Defendants' electronically on April 27, 2020, and May 21, 2020.

22                         **CLASS ACTION ALLEGATIONS**

23         141.   Plaintiffs bring this lawsuit as a class action on behalf of themselves

24  and all similarly-situated persons pursuant to Federal Rules of Civil Procedure

25  23(a) and (b)(1), (b)(2), (b)(3), and/or (c)(4). This action satisfies the applicable

26  numerosity, commonality, typicality, adequacy, predominance, and/or superiority

27  requirements of those provisions.

28

AMENDED CLASS ACTION COMPLAINT FOR
DAMAGES

142.   The proposed Class is defined as follows:  All persons in the United States, who sailed as passengers on the M/V GRAND PRINCESS cruise from San Francisco, California, leaving on February 11, 2020, roundtrip to Mexico.

143.   Excluded from the proposed Class are: (1) CARNIVAL and PRINCESS, any entity or division in which either have a controlling interest, and its legal representatives, officers, directors, assigns and successors; (2) the judicial officer(s) to whom this case is assigned and the judicial officer(s)' immediate family and legal staff; and (3) governmental entities. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, otherwise divided into subclasses, or modified in any other way.

144.   The individual Plaintiffs named in this complaint support the use of the class action mechanism to achieve economy, efficiency, fairness, and consistency of result by determining the important common questions raised in this action on a common basis.

**A.**   <u>**Numerosity**</u>

145.   There were, on information and belief, approximately 2,422 passengers on the M/V GRAND PRINCESS for the cruise that is the subject of this action. Their exact number and identities can be readily ascertained from Defendants' records. The individual joinder of all passengers is impractical, and the class action procedure is more practical, cost-effective, inclusive, and efficient than multiple lawsuits on the common questions of law and fact that unite the class, or piecemeal and incomplete individual joinder. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Health and Human Services.

1

**B.**     **Typicality**

2      146.   The claims of Plaintiffs are typical of the claims of Class Members in

3 that Plaintiffs, like all Class Members, sailed on the leg of the M/V GRAND

4 PRINCESS cruise that began on February 11, 2020 and returned on February 21,

5 2020. Plaintiffs, like all Class Members, have been damaged by Defendants'

6 misconduct in that they sailed on a cruise they would not have sailed on and

7 suffered significant injury, emotional distress and economic damage, including

8 medical monitoring, caused by the negligence of the Defendants. The factual bases

9 of CARNIVAL and PRINCESS's misconduct are common to all Class Members

10 and represent a common thread of misconduct resulting in injury to all Class

11 Members.

12      **C.**     **Adequate Representation**

13      147.   Plaintiffs DUC CHUNG, BURNETTA EVERETT, DWIGHT

14 EVERETT, CONNIE SIMMONS, JAMES SIMMONS and MICHAEL SIMMONS

15 will fairly and adequately represent and protect the interests of the Class Members.

16 Plaintiffs DUC CHUNG, BURNETTA EVERETT, DWIGHT EVERETT,

17 CONNIE SIMMONS, JAMES SIMMONS and MICHAEL SIMMONS have

18 retained counsel with substantial experience in prosecuting class actions, aggregate

19 suits, and mass torts.

20      148.   Plaintiffs DUC CHUNG, BURNETTA EVERETT, DWIGHT

21 EVERETT, CONNIE SIMMONS, JAMES SIMMONS, and MICHAEL

22 SIMMONS, and their counsel are committed to vigorously prosecuting this action

23 on behalf of all Class Members, and have the financial resources to do so. Neither

24 Plaintiffs DUC CHUNG, BURNETTA EVERETT, DWIGHT EVERETT,

25 CONNIE SIMMONS, JAMES SIMMONS, and MICHAEL SIMMONS, nor their

26 counsel have interests adverse to those of the Class Members.

27

28

AMENDED CLASS ACTION COMPLAINT FOR
DAMAGES

D.    **Predominance of Common Issues**

149.   There are numerous questions of law and fact, including those related to Defendants' knowledge, conduct, and duties throughout the events described in this Complaint, common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include, *inter alia*:

a.    what Defendants knew about the presence and risks associated with the COVID-19 virus, and contagions generally, and when they knew it;

b.    whether Defendants should have canceled the subject cruise to avoid exposing passengers to a deadly pathogen and/or taken other steps to avoid exposing passengers to a deadly pathogen, such as imposing social distancing requirements, eliminating mass gatherings, and quarantining;

c.    whether, in light of the widespread knowledge of COVID-19 and Defendants' knowledge of the risk of contagion aboard cruise ships, Defendants had a duty to conduct medical screenings of passengers prior to boarding Plaintiffs and others onto the M/V GRAND PRINCESS on February 11, 2020;

d.    whether Defendants had a duty to decontaminate the M/V GRAND PRINCESS after they knew or should have known that individuals aboard the M/V GRAND PRINCESS prior to the subject cruise were or were potentially carriers of the COVID-19 virus;

e.    whether Defendants had a duty to disclose to passengers onboard the M/V GRAND PRINCESS that at least one person onboard the vessel was experiencing symptoms of COVID-19, and the related risks that Plaintiffs could contract and /or spread the virus;

f.      whether Defendants had a duty to institute social distancing or quarantine protocols on the ship when they became aware that at least one passenger onboard was suffering from COVID-19 symptoms;

g.      whether Defendants failed to disclose, during the vessel's trip or in the days immediately following, that passengers and crew aboard the M/V GRAND PRINCESS between February 11, 2020, and February 21, 2020, were or were potentially carriers of the COVID-19 virus and other relevant information;

h.      interpretation of the applicable contract documents and the associated "Passenger Bill of Rights" incorporated therein;

i.      whether Defendants acted as alter egos and/or agents, such that they should be held jointly liable for the conduct alleged herein;

j.      whether CARNIVAL is liable for the acts, omissions, and violations described in this Complaint;

k.      whether PRINCESS is liable for the acts, omissions, and violations described in this Complaint; and

l.      whether the conduct of any or all of the defendants warrants the imposition of punitive damages to vindicate the societal interest in punishment and deterrence.

**E.      Superiority**

150.   Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of CARNIVAL's and PRINCESS's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

151.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims (compared to the cost of litigation), it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct.

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1   Absent a class action, Class Members will continue to incur damages, and
2   Defendants' misconduct will continue without remedy.

3       152.   Class treatment of common questions of law and fact is superior to
4   other available procedures, such as multiple individual actions or piecemeal
5   litigation because class treatment will conserve the resources of the courts and the
6   litigants, and will promote consistency and efficiency of adjudication.

7       **F.     Limited Fund**

8       153.   In an abundance of caution, Plaintiffs take note of the presently
9   apparent financial circumstances of CARNIVAL and/or PRINCESS to allege the
10  possibility that their assets and resources available to fairly compensate Plaintiffs
11  and Class Members, to satisfy appropriate punitive damages awards, and/or
12  otherwise fairly address the claims against them may constitute a "limited fund"
13  within the meaning of *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), such that
14  class certification under Rule 23(b)(1)(B) is necessary and appropriate as a matter
15  of due process and equity.

16      **G.     Mass Action**

17      154.   In the alternative, this matter should proceed as a mass action, as
18  defined in 28 U.S.C. § 1332 (d)(11)(B)(i) and should be tried jointly on the ground
19  that plaintiffs' claims involve common questions of law or fact, including as set
20  forth above.

21      155.   Plaintiffs' individual claims exceed the required jurisdictional amount
22  of $75,000.00.

23                          **CLAIMS FOR RELIEF**

24                          **FIRST CAUSE OF ACTION**
25                   **NEGLIGENCE AGAINST ALL DEFENDANTS**

26      156.   Plaintiffs re-allege all allegations in paragraphs 1 through 155 as if
    alleged fully herein.

27
28      157.   Defendants CARNIVAL and PRINCESS owed Plaintiffs, and the
    Class, who were passengers who boarded the M/V GRAND PRINCESS on

                              - 39 -

February 11, 2020, and who Defendants therefore had a custodial relationship over, a duty to ensure that they would not be exposed to an unreasonable risk of harm.

158.   CARNIVAL and PRINCESS held themselves out as committed to and responsible for ensuring the health and safety of their vessels and the passengers onboard those vessels—including the M/V GRAND PRINCESS. Plaintiffs and Class members took Defendants at their word and put themselves in Defendants hands for the full duration of the voyage that is the subject of this Complaint. Plaintiffs and Class members relied on Defendants to ensure their security. Thus, Defendants owed Plaintiffs and the Class a duty to take actions to prevent and mitigate the risk of threats to passengers' health and safety, including by ensuring that the M/V GRAND PRINCESS was properly cleaned, disinfected, and safely maintained. Furthermore, Defendants owed Plaintiffs and Class members a duty to not take actions that would exacerbate the spread and threat of COVID-19 onboard the ship.

159.   Defendants knew or should have known the unique conditions aboard cruise ships that create a particular risk of viral outbreak. Defendants knew or should have known that cruise ships owned and operated by Defendants had been the sites of prior, lethal outbreaks of COVID-19, and should have been aware of new guidelines for the cruise industry published by Dr. Hadjichristoulou and a team of European experts on February 3, 2020. In particular, Defendants had knowledge of the actual risks facing passengers based on the outbreak of the virus on the M/V Diamond Princess a mere three weeks prior to the instant outbreak.

160.   Defendants knew or should have known that passengers boarding the M/V GRAND PRINCESS could be carriers of COVID-19, and that crew members aboard the M/V GRAND PRINCESS were or could have been exposed to COVID-19 and were or could have been carriers of the virus, but did not institute any screening procedures prior to the February 11, 2020, embarkation of the M/V Grand Princess.

AMENDED CLASS ACTION COMPLAINT FOR
DAMAGES

1     161.   Defendants failed to do what a reasonably careful cruise ship owner
2     and operator would do under the circumstances.

3     162.   Defendants breached their duties to Plaintiffs and the Class when, with
4     the aforementioned knowledge, Defendants nevertheless chose to embark on the
5     San Francisco-Mexico voyage.

6     163.   Defendants also breached their duties when, with that same
7     knowledge, they chose not to screen or medically examine any passengers or crew
8     members, or prevent those infected with the virus from boarding the ship, prior to
9     embarkation on February 11, 2020, or throughout the cruise at any ports of call
10    after passengers had left and returned to the ship.

11    164.   Additionally, Defendants breached their duties to Plaintiffs and the
12    Class when Defendants repeatedly failed to notify passengers aboard the M/V
13    GRAND PRINCESS during the instant voyage that passengers traveling alongside
14    them were suffering from COVID-19 symptoms.

15    165.   If Defendants had adequately informed Plaintiffs and the Class prior to
16    boarding, or at any other time, of the relevant information in Defendants'
17    possession, including facts regarding Defendants' lack of adequate disinfecting
18    procedures on the M/V GRAND PRINCESS, lack of adequate quarantining
19    procedures, and the actual risk of exposure to COVID-19, Plaintiffs and the Class
20    could have made informed decisions about their health and their families' health,
21    including disembarking from or not boarding the vessel.

22    166.   Defendants repeatedly breached their duties to Plaintiffs and the Class
23    when, throughout the San Francisco-Mexico voyage, with the aforementioned
24    knowledge, they repeatedly chose not to inform Plaintiffs of the continuing and
25    growing risks of contracting COVID-19, and chose not to provide Plaintiffs with
26    the informed option to disembark at one of the vessel's ports of call.

27    167.   Finally, Defendants continued to breach their duties to Plaintiffs and
28    the Class when, after learning that at least one passenger onboard was suffering

AMENDED CLASS ACTION COMPLAINT FOR
DAMAGES

from COVID-19 symptoms, they, *inter alia*:  chose not to warn Plaintiffs' and the Class of the potential for infection; failed to implement quarantine or social distancing protocols; chose to continue operating large, public gatherings and meals; chose to continue to operate daily turndown service; and chose to continue hosting communal activities.

168.   As a direct and proximate result of Defendants' breach of their duties of care, Plaintiffs experienced COVID-19 associated symptoms as described above in paragraphs 119 through 128.  .

169.   As a direct and proximate result of PRINCESS's and CARNIVAL'S failure to safeguard Plaintiffs and the class, and as a direct and proximate result of PRINCESS's and CARNIVAL's other acts and omissions as laid out herein, Plaintiffs were directly exposed COVID-19 and to actual risk of immediate physical injury, Plaintiffs and the Class have suffered physical injury, emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame. They were traumatized by the reasonable apprehension of developing COVID-19. It is expected that they will continue to suffer and will, in the future, require medical services not of a kind generally anticipated as part of the effects of daily life.

### SECOND CAUSE OF ACTION
### GROSS NEGLIGENCE AGAINST ALL DEFENDANTS

170.   Plaintiffs re-allege all allegations in paragraphs 1 through 155.

171.   Defendants PRINCESS and CARNIVAL owed duties to Plaintiffs and the Class to:  safeguard against and mitigate the risks of passenger injury and illness; appropriately disinfect and sanitize the M/V GRAND PRINCESS, in light of the circumstances of a global pandemic; notify Plaintiffs and the Class of the actual and especially high risk of contracting COVID-19 aboard the M/V GRAND PRINCESS; disembark passengers and crew members who had likely come into

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1  contact with individuals infected with COVID-19;and implement medical screening

2  and examination protocols for crew and passengers.

3       172.   Defendants knew of the unreasonably high risk of viral contagion of

4  COVID-19 on cruise ships, and Defendants knew that it was especially dangerous

5  to expose Plaintiffs and the rest of the Class to COVID-19 in light of the prior

6  situation on the Diamond Princess off the coast of Japan.

7       173.   Defendants' conduct in deciding to continue to operate the M/V

8  GRAND PRINCESS with Plaintiffs and the Class aboard, even with the

9  aforementioned knowledge, demonstrates an intentional failure to do what a

10  reasonably careful cruise ship owner and operator would do under the

11  circumstances, exhibits a willful and conscious disregard for the safety of Plaintiffs

12  and the Class, and evidences recklessness and indifference by Defendants, which

13  constitutes gross negligence.

14       174.   Defendants' failure to abide by the guidelines issued on February 3,

15  2020, by not disembarking, quarantining or otherwise sheltering in their cabins the

16  passengers and crew members known to have come into contact with the passenger

17  suffering from COVID-19 symptoms onboard the instant cruise demonstrates a

18  willful and conscious disregard for the rights and safety of others and amounts to an

19  extreme departure of what a reasonably careful cruise ship owner and operator

20  would do.

21       175.   Defendants' choice not to warn Plaintiffs and the Class of their actual

22  risk of harm in being exposed to COVID-19 after learning about a passenger

23  onboard who came down with symptoms (and later died) constitutes a failure to

24  provide even a modicum of care to Plaintiffs and the Class. The continued and

25  repeated choice not to provide passengers with notice of the actual risks facing

26  them demonstrates a willful and conscious disregard for the rights and safety of

27  others and amounts to an extreme departure of what a reasonably careful cruise ship

28  owner and/or operator would do.

AMENDED CLASS ACTION COMPLAINT FOR
DAMAGES

176.   Moreover, Defendants' behavior demonstrated a willful and conscious disregard for the rights and safety of others, and an extreme departure of what a reasonably careful cruise ship owner and/or operator would do in their continued and repeated choices to:  not effectively sanitize and disinfect the M/V GRAND PRINCESS during the San Francisco-Mexico voyage; not institute medical screening and examinations for passengers and crew members; host large social gatherings and meals; conduct daily turn-down service; and not implement quarantine or social distance protocols at any point during the voyage. These decisions manifest Defendants' utter failure to provide even a modicum of care to Plaintiffs and the Class.

177.   Defendants chose to place profits over people, including the safety of their passengers, crew, and the general public in continuing to operate business as usual, despite their knowledge of the actual—potentially lethal—risk to Plaintiffs and the Class.

178.   Indeed, as a direct and proximate result of Defendants' extreme departure from the ordinary standard of care and their failure to meet their duties of care to Plaintiffs and the Class by providing even scant care, Plaintiff s experienced COVID-19-associated symptoms as described in paragraphs 119 through 128.

179.   Finally, as a direct and proximate result of Defendants' gross negligence in exposing Plaintiffs and the Class to actual risk of immediate physical injury, Plaintiffs and the Class have suffered emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame. They were traumatized by the fear of developing COVID-19. It is expected that they will continue to suffer and will, in the future, require medical services not of a kind generally accepted as a typical part of daily life.

### THIRD CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

180.   Plaintiffs re-allege all allegations in paragraphs 1 through 155.

181.   Defendants CARNIVAL and PRINCESS knew or should have known of the actual, unique risk of viral contagion of COVID-19 aboard cruise ships, and, in light of the situation on the Diamond Princess only 3 weeks prior to the instant voyage on the M/V GRAND PRINCESS, Defendants knew or should have known that it was especially dangerous to expose Plaintiffs and the rest of the Class to COVID-19.

182.   Even in light of this information, however, Defendants failed to implement any effective screening or medical examination procedures for passengers boarding the ship prior to the voyage.

183.   Defendants also knew or should have known that at least one passenger traveling on the instant trip aboard the M/V GRAND PRINCESS was experiencing symptoms of COVID-19 (that passenger eventually tested positive for COVID-19).

184.   Nevertheless, Defendants continually and repeatedly acted or failed to act in ways that caused Plaintiffs to be exposed to COVID-19, including but not limited to:  failing to take any effective actions to prevent or mitigate the spread of COVID-19; failing to alert passengers to the possibility of infection aboard the ship; hosting and encouraged participation in large group activities and events that Defendants knew could lead to large-scale infection among the crew and passengers.

185.   These choices by Defendants created a dangerous and threatening environment in which Plaintiffs and the Class were forced to live for almost two weeks, at all times directly exposed to COVID-19 and at risk of becoming infected with, made ill by, and/or spreading COVID-19. And Defendants' acts and omissions likely exacerbated the spread of the virus aboard the ship.

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

186.   As the direct and proximate result of Defendants' actions and omissions throughout the duration of their voyage aboard the M/V GRAND PRINCESS, Plaintiffs and members of the Class were in the "zone of danger," where they were directly exposed to a potentially-lethal virus, and placed at immediate risk of—and actually suffered—actual physical harm as a result of their direct and prolonged exposure to COVID-19.

187.   As a result of this exposure, which was directly and proximately caused by Defendants' acts and omissions, Plaintiffs and members of the Class experienced severe psychic injuries, of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, when they were forced to watch first hand as their friends and family members became ill with COVID-19, were concerned for their own safety and well-being, and continue to expect that they may begin exhibiting symptoms or health complications not yet identified as a result of COVID-19. Plaintiffs suffered physical and emotional injury as the direct and proximate result of Defendants' misconduct.

188.   As a direct and proximate result of Defendants' extreme departure from the ordinary standard of care and their failure to meet their duties of care to Plaintiffs and the Class by providing even scant care, Plaintiffs experienced physical harms and negative health outcomes as described in paragraphs 119 through 128.

189.   Finally, as a direct and proximate result of Defendants' gross negligence, Plaintiffs and the Class were exposed to COVID-19 and threatened with serious physical injury. As a result, Plaintiffs and the Class have suffered emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame related to their own risk of contracting COVID-19 and the suffering they witnessed among their fellow passengers who contracted COVID-19. Plaintiffs and

members of the class were traumatized by the reasonable apprehension of their family members, friends and fellow passengers developing COVID-19 and by the threat to their own health of becoming infected with the virus or suffering future negative health outcomes or complications related to exposure to and / or contraction of the virus.

190.   Plaintiffs and Class members were endangered and harmed by Defendants' actions when they were forced to travel on an infested vessel without appropriate information about the risks facing them. It is expected that Plaintiffs and the Class will continue to suffer and will, in the future, require medical services not of a kind generally anticipated as a typical part of daily life.

**FOURTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

191.   Plaintiffs re-allege all allegations in paragraphs 1 through 155 as if alleged fully herein.

192.   CARNIVAL and PRINCESS knew or should have known of the unique conditions aboard cruise ships that render the risk of viral contagion especially dangerous and likely, and, based on their experience with COVID-19 outbreak aboard the Diamond Princess only 3 weeks prior to the instant voyage on the M/V GRAND PRINCESS, Defendants knew or should have known that exposure to COVID-19 was threatening to passengers'—including Plaintiffs'— lives and well-being.

193.   By or before the time of boarding passengers onto the M/V GRAND PRINCESS, on February 11, 2020, Defendants knew or should have known of the extreme risks to health and safety—including the possibility of death—presented by COVID-19.

194.   In light of this knowledge and experience, and particularly given that, *first*, cruise ships present an especially heightened risk of contagion and, *second*, that once they have boarded, passengers have no option of disembarking while the

AMENDED CLASS ACTION COMPLAINT FOR
DAMAGES

ship remains at sea, Defendants exhibited extreme and outrageous conduct when, *inter alia*, Defendants boarded Plaintiffs and the Class onto the M/V GRAND PRINCESS on February 11, 2020, without taking any effective measures to medically screen or examine passengers for COVID-19 symptoms.

195.   Defendants also knew or should have known during the instant trip that at least one passenger aboard the M/V GRAND PRINCESS was experiencing symptoms of COVID-19.

196.   Defendants additionally acted extremely and outrageously when they chose not to effectively clean, sanitize, sterilize, or disinfect the M/V GRAND PRINCESS during the instant trip.

197.   Defendants exhibited repeated and continued extreme and outrageous conduct when Defendants failed to: alert Plaintiffs to the fact that at least one passenger on the trip was experiencing COVID-19 symptoms and had come into contact with passengers and crew members; notify Plaintiffs and the Class about the actual and potential threat of exposure to, infection of, and the possibility of spreading COVID-19 aboard the ship; failed to advise Plaintiffs and the Class about the possibility and health benefits of disembarking during the trip, at one of the vessel's ports of call.

198.   Defendants continued to behave extremely and outrageously when, after learning about the ill passenger, they:  encouraged Plaintiffs and the Class to continue mingling and participating in large group events and functions throughout the duration of the trip; continued to provide turn down service to passengers despite the fact that crew members had likely been exposed to COVID-19; and failed to institute any policies for quarantine, isolation, or social distancing for passengers.

199.   The acts and omissions described herein not only failed to protect Plaintiffs from exposure to and contraction of COVID-19, but likely exacerbated

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

the spread of the virus among the passengers, including Plaintiffs and the Class ultimately enlarging the threat and harms to Plaintiffs and the Class.

200.   As a direct and proximate result of Defendants' intentional and reckless behavior and omissions, Plaintiffs and the Class suffered severe emotional distress and physical harm.

201.   Plaintiffs and the Class were forced to watch as their friends and family members became ill with COVID-19, and, all the while, know that their safety and well-being were at extreme risk. Plaintiffs suffered physical and emotional injury as the direct and proximate result of Defendants' misconduct, and Plaintiffs continue to suffer from anxiety and the reasonable apprehension that they may still begin exhibiting symptoms or experience as-yet-unidentified complications due to their exposure to and potential contraction of COVID-19 while aboard the M/V GRAND PRINCESS.

202.   As a direct and proximate result of Defendants' extreme departure from the ordinary standard of care and their failure to meet their duties of care to Plaintiffs and the Class by providing even scant care, Plaintiffs experienced physical harms in the form of COVID-19-associated symptoms and negative health outcomes as described in paragraphs 119 through 128.

203.   Finally, as a direct and proximate result of Defendants' behavior, which exposed Plaintiffs and the Class to COVID-19 and to actual risk of immediate physical injury, Plaintiffs and the Class have suffered emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame related to their own exposure to COVID-19 and the suffering they witnessed among their fellow passengers who contracted COVID-19. Plaintiffs and members of the class were traumatized by the reasonable apprehension of their family members, friends and fellow passengers developing COVID-19 and by the past and ongoing threat to

their own health of becoming infected with the virus and potentially suffering from as-yet-unidentified negative health outcomes and complications.

204.   Plaintiffs and Class members were endangered and harmed by Defendants' actions when they were forced to travel on an infected vessel without appropriate information about the risks facing them. It is expected that Plaintiffs and the Class will continue to suffer and will, in the future, require medical services not of a kind generally accepted as part of the wear and tear of daily life.

205.   Throughout the events described in this Complaint, Defendants repeatedly acted with conscious, callous, and/or reckless disregard for the rights, interests, health and safety of their passengers, such that the imposition of punitive damages, under CA Civil Code Section 3294 and/or all other applicable law, is necessary and appropriate to punish them for their course of conduct, and to deter them and others, and protect the public, from the consequences of similar conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, and all others similarly situated, pray for judgment against Defendants, and each of them, as follows:

1.   An order certifying the proposed Class pursuant to Fed. R. Civ. P. Rule 23(a) and (b)(1), (b)(2), (b)(3) and/or (c)(4), designating Plaintiffs DUC CHUNG, BURNETTA EVERETT, DWIGHT EVERETT, CONNIE SIMMONS, JAMES SIMMONS and MICHAEL SIMMONS as named representatives of the Class and designating the undersigned as Class Counsel;

2.   An award of damages totaling in excess of Five Million Dollars ($5,000,000.00), inclusive of compensatory damages for Plaintiffs' injuries, including emotional pain and suffering and any other damages allowed by law, in an amount to be proven at trial;

3.   An award of the costs associated with the ongoing medical monitoring and diagnostic examinations required to diagnose, prevent, and/or treat current or

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

future injury related to Plaintiffs' and Class Members' exposure to, illness and disease caused by, and contraction, asymptomatic contraction, and/or potential contraction of COVID-19, in light of the evolving scientific understanding of the full risk and scope of health outcomes related to and / or resulting from the virus;

4.     An injunction requiring Defendants to: disclose to future passengers the nature and rate of risk of communicable disease upon their cruise ships; implement disinfecting and sanitizing procedures on each of their ships in between and during voyages; implement appropriate social distancing and physical distancing protocols to avoid or reduce the transmission of communicable pathogens; disembark and quarantine passengers when Defendants become aware of a heightened risk of communicable disease aboard a ship; and canceling or discontinuing the operation of cruises when Defendants know or should have known of a potential deadly pathogen or similar aboard their ships.

5.     An award of attorneys' fees and costs, as allowed by law;

6.     An award of pre-judgment and post-judgment interest, as provided by law;

7.     Leave to amend this Complaint to conform to the evidence produced at trial; and

8.     For such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated:      August 28, 2020          NELSON & FRAENKEL LLP


By:   */s/ Gretchen M. Nelson*
_____

Gretchen M. Nelson (112566)
gnelson@nflawfirm.com
Carlos F. Llinás Negret (284746)
cllinas@nflawfirm.com
601 So. Figueroa Street, Suite 2050
Los Angeles, CA 90017
Telephone:  213-622-6469
Facsimile:  213-622-6019

Dated:      August 28, 2020          MARY ALEXANDER & ASSOCIATES, P.C.


By:   */s/ Mary E. Alexander*
_____

Mary E. Alexander, Esq. (SBN 104173)
*malexander@maryalexanderlaw.com*
Brendan D.S. Way, Esq. (SBN 261705)
*bway@maryalexanderlaw.com*
44 Montgomery Street, Suite 1303
San Francisco, California 94104
Telephone: (415) 433-4440
Facsimile: (415) 433-5440

AMENDED CLASS ACTION COMPLAINT FOR
DAMAGES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:      August 28, 2020

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP


By:   */s/ Elizabeth J. Cabraser*

Elizabeth J. Cabraser (SBN 083151)
*ecabraser@lchb.com*
Jonathan D. Selbin (SBN 170222)
*jselbin@lchb.com*
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
Mark P. Chalos (*Pro Hac Vice*)
*mchalos@lchb.com*
222 2nd Avenue South, Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000
Facsimile: (212) 313-9965

*Attorneys for Plaintiffs*

AMENDED CLASS ACTION COMPLAINT FOR
DAMAGES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I, Elizabeth J. Cabraser, hereby certify that on August 28, 2020, I caused to be electronically filed **AMENDED CLASS ACTION COMPLAINT FOR DAMAGES** with the Clerk of the United States District Court for the Central District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.


*/s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser

AMENDED CLASS ACTION COMPLAINT FOR
DAMAGES